

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-21-00041-CV

---

THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON, Appellant

V.

DR. JOHN MCNEELY, Appellee

---

On Appeal from the 11th District Court
Harris County, Texas
Trial Court No. 2020-32037

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

John McNeely, a former staff physician and clinical assistant professor of anesthesiology, sued his employer, the University of Texas Health Science Center at Houston (UTHSC), in Harris County[1] for age-related employment discrimination after he was terminated from employment at the age of sixty-three and replaced by a physician younger than forty. UTHSC filed a plea to the jurisdiction arguing that McNeely failed to establish his age-related discrimination claim through direct or circumstantial evidence. After the trial court denied the plea to the jurisdiction, UTHSC filed this interlocutory appeal. Because we find that the plea should have been granted, we reverse the trial court's ruling and render judgment dismissing McNeely's claims for lack of jurisdiction.[2]

*(1) Legal Framework*

"Sovereign immunity . . . exist[s] to protect the State and its political subdivisions from lawsuits and liability for money damages." *Univ. of Tex. MD Anderson Cancer Ctr. v. Simpson*, No. 01-20-00679-CV, 2021 WL 3083104, at *4 (Tex. App.—Houston [1st Dist.] July 22, 2021, no pet. h.) (mem. op.). "[S]overeign immunity 'extends to various divisions of state government, including agencies, boards, hospitals, and universities.'" *Id.* (quoting *Ben Bolt-Palito Blanco*

---

[1]Originally appealed to the First Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the First Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]The trial court also granted McNeely's motion to compel discovery, which McNeely mischaracterizes as jurisdictional discovery. Instead, the record shows that McNeely propounded and sought to compel production of documents not limited to the jurisdictional inquiry, including requests to produce trial exhibits, documents showing that McNeely's supervisor was trained on age discrimination, and documents in support of UTHSC's affirmative defenses of statute of limitations, waiver, laches, collateral estoppel, ratification, res judicata, and unclean hands. Because nothing in the trial court's order indicated that its grant of the motion to compel discovery was limited to jurisdictional facts, it appears that the trial court denied the plea to the jurisdiction and then granted McNeely's motion to compel general discovery.

*Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323–24 (Tex. 2006)).  "We interpret statutory waivers of sovereign immunity narrowly, as the Texas Legislature's intent to waive immunity must be clear and unambiguous."  *Id.* "Without an express waiver of sovereign immunity or governmental immunity, courts do not have subject-matter jurisdiction over suits against the State or its political subdivisions."  *Id.* (citing *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224–25 (Tex. 2004)).

It is undisputed that UTHSC is protected by sovereign immunity.  Yet, the Texas Commission on Human Rights Act (TCHRA) waives immunity when "[a]n employer commits an unlawful employment practice if because of . . . age the employer . . . discharges an individual . . . ."  TEX. LAB. CODE ANN. § 21.051(1).  One of the purposes of the TCHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964."  TEX. LAB. CODE ANN. § 21.001(1).

UTHSC's plea to the jurisdiction is based on sovereign immunity.  "We review de novo a trial court's ruling on a jurisdictional plea."  *Simpson*, 2021 WL 3083104, at *3 (citing *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist.*, 212 S.W.3d at 323; *City of Houston v. Vallejo*, 371 S.W.3d 499, 501 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)).  "A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction."  *Id.* (citing *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Villarreal v. Harris Cty.*, 226 S.W.3d 537, 541 (Tex. App.—Houston [1st Dist.] 2006, no pet.)); *see Sullivan v. Univ. of Tex. Health Sci. Ctr. at Houston Dental Branch*, No. 01-08-00327-CV, 2008 WL 5179023, at *1 (Tex.

3

App.—Houston [1st Dist.] Dec. 11, 2008, pet. denied) (mem. op.). "A defendant may use a plea to the jurisdiction to challenge whether the plaintiff has met [the] burden of alleging jurisdictional facts or to challenge the existence of jurisdictional facts." *Simpson*, 2021 WL 3083104, at *3 (citing *Miranda*, 133 S.W.3d at 226–27).

When "the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018). "In reviewing such a plea, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Simpson*, 2021 WL 3083104, at *3 (citing *Alamo Heights*, 544 S.W.3d at 771; *Miranda*, 133 S.W.3d at 228). "However, we cannot disregard evidence necessary to show context or evidence and inferences unfavorable to the nonmovant if reasonable jurors could not do so." *Id.* (citing *Alamo Heights*, 544 S.W.3d at 771).

"This standard mirrors our summary-judgment standard under Texas Rule of Civil Procedure 166a(c) and places the burden on the governmental unit, as the movant, to meet the standard of proof to support its contention that the trial court lacks subject-matter jurisdiction." *Id.* (citing *Miranda*, 133 S.W.3d at 228; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012)).

"In assessing whether subject-matter jurisdiction exists, we first focus on whether the plaintiff's petition, construed in the plaintiff's favor, pleads facts that affirmatively show that subject-matter jurisdiction exists." *Univ. of Tex. MD Anderson Cancer Ctr. v. Contreras*, 576

4

S.W.3d 439, 442–43 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing *Hearts Bluff Game Ranch v. State*, 381 S.W.3d 468, 476 (Tex. 2012)). "Sometimes, however, we also must consider evidence as to jurisdictional facts." *Id.* (citing *Hearts Bluff*, 381 S.W.3d at 476). "If a fact issue exists as to whether subject-matter jurisdiction exists and the issue is inextricably entwined with the merits, the resolution of this issue is for the fact-finder." *Id.* (citing *Miranda*, 133 S.W.3d at 226–28). "But evidence also may undermine the jurisdictional allegations of the plaintiff's petition." *Id.* (citing *Hearts Bluff*, 381 S.W.3d at 476). "If the undisputed evidence negates jurisdiction, then the plaintiff's suit must be dismissed." *Id.* (citing *Miranda*, 133 S.W.3d at 234).

"[W]hen analyzing a claim brought under the TCHRA, we look not only to state cases but also to analogous federal statutes and the cases interpreting those statutes." *Hartranft v. UT Health Sci. Ctr.-Houston*, No. 01-16-01014-CV, 2018 WL 3117830, at *11 (Tex. App.—Houston [1st Dist.] June 26, 2018, no pet.) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012)). "Discrimination and retaliation cases under the TCHRA can be established with either direct or circumstantial evidence." *Id.*

"In the absence of direct evidence of discrimination, the employee must make a prima facie case of discrimination under the *McDonnell-Douglas* burden-shifting analysis."[3] *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2015, no pet). "The three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,

---

[3]"Direct evidence is evidence that, if believed, 'proves the fact of discriminatory animus without inference or presumption.'" *Anderson*, 458 S.W.3d at 643 (quoting *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.—Dallas 2012, no pet.). "If an inference is required for the evidence to be probative as to the employer's discriminatory animus, the evidence is circumstantial, not direct." *Id.* Here, as shown by the discussion below, we find no direct evidence of discriminatory animus.

5

411 U.S. 792, 802 (1973)[,] enables an employee to establish discrimination with circumstantial evidence." *Hartranft*, 2018 WL 3117830, at *11. "If the employee can establish a prima facie case of discrimination, a rebuttable presumption of discrimination arises, which can alone sustain a discrimination claim." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). "But the employer can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). "Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802); *see Democratic Sch. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 308 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("If the employer rebuts the presumption of discrimination, the burden of production shifts back to the employee to show that the employer's stated reason was a pretext for discrimination."). For that reason, "when jurisdictional evidence negates the prima facie case or . . . rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea." *Alamo Heights*, 544 S.W.3d at 764. "In both direct- and circumstantial-evidence cases, the burden of persuasion remains at all times with the employee." *Hartranft*, 2018 WL 3117830, at *11 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

*(2)     Factual and Procedural Background*

After receiving notice of his termination from Holger Eltzschig, who was hired in September 2016 to serve as Chairman of UTHSC's Department of Anesthesiology (Department)

at the McGovern Medical School, McNeely filed a complaint with the Texas Workforce Commission Civil Rights Division for unlawful discharge by UTHSC from his positions as assistant professor and staff physician. In the complaint, McNeely said,

> Dr. Eltzschig has made clear that he is terminating Dr. McNeely due to Dr. McNeely's age. On three occasions, Dr. Eltzschig has informed Dr. McNeely that the department is under budget pressure and has had to cut costs. On three occasions, Dr. Eltzschig brought in three different younger replacements for Dr. McNeely who are each around age 40 or younger, including the latest who is 30 years old, to replace Dr. McNeely, who as an older (age 63) and more experienced doctor, is paid more. Dr. McNeely was terminated despite outstanding performance reviews and multiple letters of support from other doctors he worked with, all to save money by replacing him with a younger physician who is being paid less.

McNeely obtained a right-to-sue letter. In this lawsuit, McNeely alleged that he was replaced by Dallas Clendeninn,[4] a thirty-year-old, part-time, non-benefits-eligible staff physician who was hired by UTHSC in 2017 while Clendeninn was completing his fellowship.

In response to McNeely's claims, UTHSC filed a plea to the jurisdiction and argued that the decision not to renew McNeely's contract "was due to a reduction-in-force . . . as a result of budget concerns." According to UTHSC, the Department was forced to cut payroll and eliminate three benefit-eligible positions, and McNeely was selected for non-renewal of his employment contract "because he was the only benefits eligible Staff Physician that did not have a salaried faculty appointment." UTHSC also argued that McNeely, who also served as the medical director of anesthesiology for the Ambulatory Services Center of Memorial Hermann

---

[4]This physician's surname has been spelled various ways in the record. We have chosen to use the spelling "Clendeninn" throughout.

Hospital-Houston Medical Center (ASC), improperly relied on evidence that ASC sought to replace him as medical director.

UTHSC's plea to the jurisdiction was supported by Eltzschig's declaration. Eltzschig described McNeely's position, the relationship between UTHSC and the ASC, and the decisions related to McNeely's termination. Eltzschig said that UTHSC had both faculty and non-faculty positions and that non-faculty positions, including staff physicians, are categorized as administrative and professional employees who may or may not be benefit eligible, do not serve fixed terms, and are appointed at the pleasure of the president and with the approval of the executive vice chancellor for health affairs. According to Eltzschig, McNeely was hired to work in a faculty position in 2005, but voluntarily stepped down from that position in 2011 to become a non-benefit-eligible, non-faculty, staff physician.

To support UTHSC's claim that McNeely was terminated "because he was the only benefits eligible Staff Physician that did not have a salaried faculty appointment," Eltzschig said that McNeely had a voluntary faculty position as assistant professor without pay. Even so, McNeely said that his assistant professorship was not without pay and disputed UTHSC's evidence by introducing UTHSC's memorandum of appointment showing that he was compensated for both of his positions at UTHSC. McNeely's memorandum of appointment from UTHSC also showed that, as staff physician, he was required to spend eighty percent of his time at the ASC.[5]

_____

[5]Eltzschig said that McNeely remained in this position until he was "non-reappointed" on August 31, 2018.

As for UTHSC's relationship with the ASC, Eltzschig, as UTHSC's chairman of the department, was responsible for assigning anesthesiologists to work at the ASC. Eltzschig said that McNeely, who had served as the medical director at the ASC since November 1, 2007, reported directly to the UTHSC department's vice-chair of clinical affairs, Sam Gumbert, and Vice-Chair of Finance Carlos Artime, who were also responsible for the day-to-day scheduling of staffing and assignments for the ASC. Gumbert filed a declaration confirming that, in his position with UTHSC, he was responsible for the operations of all clinical affairs for the Department, which included, in part, financial and staffing coverage at the ASC. Despite this connection between UTHSC and the ASC, Eltzschig claimed that the day-to-day operations of ASC were managed by United Surgical Partners International (USPI) and that UTHSC did not control the operations of ASC. Eltzschig also said that the ASC's board members, not UTHSC, appointed ASC's medical director, although UTHSC could recommend a candidate for the position.

After Eltzschig was hired in 2016, he noted that McNeely did not have qualifications that Eltzschig believed important to enhance the success of the ASC, including regional anesthesia fellowships, business training, active teaching, and academic research activities. According to Gumbert, the ASC "saw a shift towards a more specialized surgical practice with increased diversity that often required anesthesiologists with unique, specialized regional fellowship anesthesia training." Gumbert said that Donita Fleming, regional vice president of USPI, told him and Eltzschig that the ASC stakeholders "wanted to focus on cultivating leadership partners with strong regional fellowship academic backgrounds" and said that McNeely "was unable to

9

perform the Medical Directorship position alone in part because of his limited regional proficiency."

In his 2017 evaluation as medical director, McNeely met all expectations. Even so, Eltzschig promoted UTHSC's Jennifer Wu, a doctor under forty who had an MBA, to the position of associate professor in September 2017 and recommended that the ASC hire her as co-medical director. On November 13, 2017, Theresa Le, the director of management operations for UTHSC's department, emailed Eltzschig and USPI employees that "Eltzschig ha[d] already communicated to Dr. McNeely about sharing the responsibility as well as the supplement [paid by UTHSC] with Dr. Wu," who was to be co-medical director, and that McNeely was "on board with it." Wu began working as a co-medical director with McNeely in January 2018 but left in March 2018. According to Gumbert, UTHSC leadership began considering candidates to transition into the co-director position to replace Wu. UTHSC's Sumreen Vaid-Pinyard, a doctor under forty, and Sudipta Sen, a younger doctor,[6] were "brought in on a trial basis for the role of Chief of Anesthesia [at UTHSC] and co-ASC Medical Director to replace Dr. Wu" "[s]ometime between January 4, 2018[,] to April 30, 2018." After Vaid-Pinyard's and Sen's unfruitful trials, Eltzschig turned his attention to Clendeninn, who was working on an MBA in April 2018.

Clendeninn's resume showed that he graduated from medical school in 2013, was an intern and resident at UTHSC from 2013 to 2017, and was working to complete his fellowship in regional anesthesia, acute pain medicine, and perioperative ultrasound at the time Eltzschig was considering him. He "worked as a part-time, hourly non-benefit eligible (casual) Staff Physician

_____

[6]The record does not reveal Sen's age.

10

from 7/1/2017 – 7/31/2018." Eltzschig admitted that he had shared at a staff meeting that he would recommend Clendeninn to the ASC board as a candidate for medical director on May 10, 2018, while McNeely was still serving in that position and that Clendeninn "continued to work at the ASC on a trial basis for the position of co-ASC Medical Director" from May to November 2018.[7] Although Eltzschig and Gumbert said that Clendeninn was to replace Wu, McNeely said that Eltzschig stated his intention to replace McNeely as medical director of the ASC at the meeting with others in attendance, including Clendeninn, Gumbert, Artime, and several CRNAs. Emails from several CRNAs that attended that meeting were attached to McNeely's declaration and confirmed his version of events, including that Eltzschig said he was replacing McNeely, not Wu. McNeely said that, because Clendeninn was still in his fellowship, it was necessary for him to sign off on Clendeninn's patient care and that Eltzschig expected him to train Clendeninn in the role of medical director.

---

[7]Eltzschig said,

> I recommended Dr. Clendeninn for this position because he had several important qualifications that would make him a strong leader and benefit the ASC. Dr. Clendeninn completed his regional anesthesia fellowship training in July 2018 and was therefore highly competent with all the required skills needed for regional anesthesia services at the ASC. . . . In contrast, Dr. McNeely was not fellowship trained in regional anesthesia, and was struggling to provide some of the regional anesthesia approaches that were requested by specific surgeons. . . . In addition, Dr. Clendeninn had qualifications in the use of ultrasound, a technique which helps to make regional anesthesia safer for our patients and provides better outcomes. His training in the use of ultrasound included the "Basic Focus Assessed Transthoracic Echocardiography Certification," and the "Basic Perioperative Transesophageal Echocardiography Certification and Testatmur Status." Both of these qualifications are important assets for patient safety, outcomes, and patient satisfaction. Dr. Clendeninn . . . also had MBA training that would prove useful for the financial issues at ASC. . . . Dr. Clendeninn was academically highly active, including participation at National Meetings and moderation of research sessions for regional anesthesia . . . . Dr. Clendeninn had experience in academic presentations, publications, and lectures, which made him an outstanding teacher and scholar, again, which was in line with the Vision and Mission of the Department of Anesthesiology . . . . Dr. McNeely had none of these described qualifications.

11

After that announcement, a May 29, 2018, email related to the budget asked participants to the meeting, including Eltzschig, to be prepared to discuss "faculty changes for year-end incentive requests and any growth for FY 2018." According to Eltzschig, the president of UTHSC told him on May 30, 2018, to reduce the Department budget for the upcoming fiscal year by $1,000,000.00 due to decreased funding. Eltzschig said that the only option was for him to reduce the faculty or benefit-eligible staff physician positions, an approach that was endorsed by the president and Dean Barbara Stoll at the May 30 budget meeting. Eltzschig decided to eliminate three benefit-eligible positions as a reduction in force and to spread the cuts across the general, cardiovascular and pediatric anesthesiology divisions. The pediatric anesthesiology assistant professor resigned "due to family reasons," the cardiovascular assistant professor was non-reappointed to his faculty position, and McNeely was terminated as a staff physician. Eltzschig swore that he selected McNeely for non-renewal because "he was the only employee in that division who was working as a benefits eligible Staff Position and did not have a paid faculty appointment."

Eltzschig met with McNeely on June 4, 2018, to inform him that his position as staff physician would not be renewed due to a reduction in force and, after receiving approval from the president and dean, informed McNeely of the non-renewal. Eltzschig wrote a letter to the president and dean on June 5, which stated:

> In light of the recent call for budget reduction, I would like to obtain your approval for the Department of Anesthesiology to eliminate one (1) benefit-eligible staff physician at the [ASC]. The physician affected by this position elimination will be Dr. John McNeely who is currently the sole physician that holds this type of position, at the location mentioned above . . . . This action is

12

necessary due to our budget constraint. Your consideration of this request is greatly appreciated.

The letter contained signature approvals from the president and dean. A letter to McNeely from Eltzschig dated June 5, 2018, simply said, "Per our conversation on June 4, 2018, this is to notify you that your Staff Physician position will not be renewed on September 1, 2018."

On July 2, 2018, an email from Le to Eltzschig said that the president wanted "to see proof documentation of the 3 eliminated positions [they] intended." Also on July 2, after receiving an email asking whether McNeely had "stepped down already" as medical director or whether the [ASC] needed "to send him a termination letter," Fleming said that McNeely would be "stepping down" effective September 1. The email stated that the ASC would require written notice from McNeely if he was resigning, but no written notice of resignation was included in the record. On July 10, Le emailed Melissa Pifko at UTHSC and wrote that ASC was remaking the medical directorship agreement "in place of their previous agreement with doctor John McNeely in the past" and that "all financial support [would] have to be routed through UT/Department." The record contained a new directorship agreement executed between the ASC and UTHSC showing that the ASC "desired to contract with [UTHSC] to provide [a] Physician" "to serve as Medical Director and to preside over the [ASC's] Medical Staff."

After Eltzschig's termination notice, but before its effective date, Clendeninn completed his fellowship on July 31, 2018. Evidence attached to Eltzschig's declaration showed that Clendeninn accepted UTHSC's job offer for the position of assistant professor of anesthesiology on July 27, before completing the fellowship. Yet, Eltzschig's declaration said that Clendeninn (1) "transitioned to a non-tenured faculty position as an Assistant Professor" on August 1, 2018,

13

after completing his fellowship and (2) received a letter from Eltzschig on November 8 informing him that ASC had appointed him as medical director. According to McNeely, Clendeninn was offered benefits in December 2018, after McNeely was terminated.

UTHSC's plea focused on the budgetary reasons for McNeely's termination and claimed that he was not replaced since his position as a benefits-eligible staff physician was eliminated. UTHSC argued that Clendeninn "moonlighted" as a casual employee on an as-needed basis while he completed his fellowship and that McNeely's benefit-eligible position was eliminated as opposed to the non-benefits-eligible, casual staff physician position held by Clendeninn. UTHSC also argued that McNeely had resigned from ASC's medical directorship, that UTHSC did not make employment decisions for ASC, and that McNeely failed to provide either direct or circumstantial evidence of any alleged discrimination by UTHSC.[8] As a result, UTHSC argued that sovereign immunity was not waived and that the trial court erred by denying its plea to the jurisdiction after relying on evidence McNeely submitted pertaining to ASC.

In response to the plea to the jurisdiction, McNeely argued that he had made a prima facie case of age discrimination at UTHSC, that evidence of discrimination at the ASC was relevant and that the proffered reason that he was terminated due to a reduction in force was pretext for age discrimination. McNeely presented evidence of his seasoned credentials, said

_____

[8]UTHSC also argued that McNeely failed to file an administrative complaint against the ASC and that any complaint regarding termination from the ASC was barred for failure to exhaust administrative remedies. "[E]xhaustion of administrative remedies is a mandatory prerequisite to filing a civil action alleging violations of the [T]CHRA." *Salman v. KIPP, Inc.*, No. 01-19-00886-CV, 2021 WL 2931360, at *5 (Tex. App.—Houston [1st Dist.] July 13, 2021, no pet. h.) (mem. op.) (quoting *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004). "An employee must file a charge with the TWC, allege an unlawful employment practice, state the facts on which the complaint is based, and identify the respondent." *Id.* (citing TEX. LAB. CODE ANN. § 21.201(c); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010). ASC is not a party to this case, and McNeely did not argue in his TWC complaints that he was terminated by ASC from his position as medical director. As a result, we limit our review to evidence of UTHSC's alleged discrimination.

that he was an assistant professor at UTHSC until his termination, and remained active as an instructor teaching medical students at the surgery center. UTHSC's website for the department of anesthesiology included McNeely as a faculty member. McNeely said that, in 2017, he "participated in a program called Doctoring Two and Doctoring Three which called for him to teach medical students on a weekly basis in a medical setting" and received extremely positive feedback from the students, which was proven by letters from students attached to his affidavit. His declaration asserted that Eltzschig brought in younger, less experienced, and less well-paid doctors as replacements for him on three different occasions.

McNeely argued that discriminatory intent was shown when Eltzschig announced at the May 10, 2018, meeting that he intended to replace him with Clendeninn as the ASC's medical director. McNeely said that UTHSC dictated who worked at the ASC on a daily basis and that it was impossible to continue as medical director at the ASC without being an employee of UTHSC. Even though Eltzschig claimed that McNeely resigned the position of medical director, McNeely swore that he never resigned from the ASC. McNeely pointed out that UTHSC had a financial interest in the operations of the ASC, that UTHSC was compensated for the doctors placed there, and that Eltzschig's letter to the president and dean sought permission to terminate McNeely's staff physician position "at the [ASC]."

McNeely said that, even though a reduction in force was cited as the reason for his termination, none of the evidence from UTHSC mentioned an actual reduction in force except for Eltzschig's declaration, which McNeely believed was a conclusory statement. Because the evidence showed that UTHSC's department of anesthesiology had seventy-three physicians in

15

2016, eighty-six physicians in 2018, and ninety-six physicians in 2020, McNeely argued that there was no reduction in force and that the Department had steadily grown. He also noted that the term "reduction in force" was legally defined in the University of Texas system's policies to mean that a position (not a person) was eliminated and argued that no position was eliminated since Clendeninn was a staff physician at the time of his termination, Clendeninn had been offered a paid assistant professorship, and none of the requirements of the policies were followed.

The University of Texas system's policy statement (Policy) on reductions in force stated that it could "occasionally be required to eliminate positions due to . . . budgetary needs." The Policy required a department head to describe the exact position recommended for elimination when eliminating positions through a reduction in force and then to submit the "Reduction in Force Report to the Office of Human Resources and Office of General Counsel for review." The Policy required notification in writing of the terminated position "preferably at least 50 days before termination," provision of re-employment support assistance "for any employees affected by elimination of their position," and preferential procedures for rehire for a period of six months after termination.[9]

McNeely said that he never heard about any reduction in force during his tenure at UTHSC, was never offered re-employment support, and was not provided preferential rehiring treatment even though he was willing to retain the same position at a lower compensation rate or accept a different position. McNeely's declaration stated that he offered to take a reduction in

---

[9]While UTHSC argued that it had its own policies and procedures and that the University of Texas system's policies related to reductions in force were inapplicable, a separate policy was never produced.

compensation when Eltzschig informed him by telephone on June 3 that his contract would not be renewed due to financial issues, but that Eltzschig declined his offer. After his termination, McNeely obtained four letters of support from colleagues at UTHSC praising his attitude, experience, and technical skill.

*(3)    The Plea to the Jurisdiction Should Have Been Granted*

Under the first part of the *McDonnell Douglas* framework, we first ask whether McNeely established a prima facie case of age discrimination. "The causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Alamo Heights*, 544 S.W.3d at 782. "The requirements for establishing a prima facie case 'vary depending on the circumstances.'" *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 583 (Tex. 2017)). In this age-discrimination case, a prima facie case will be made by evidence that McNeely (1) was forty years of age or older, (2) was qualified for the position at issue, (3) was terminated, and (4) "was either (a) replaced by someone significantly younger or (b) otherwise treated less favorably than others who were similarly situated but outside the protected class." *Id.* (citing *Mission Consol.*, 372 S.W.3d at 632; *AutoZone v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam)). UTHSC does not dispute that McNeely met the first three elements but challenges the evidence on the fourth element.

UTHSC argues that it did not replace McNeely with someone younger because no one was hired to fill a benefits-eligible staff physician position and Clendeninn's appointment as

17

medical director of the ASC was not attributable to UTHSC. "But . . . the determination of whether one employee replaced another cannot depend solely on the employees' job titles and salaries." *Flores*, 612 S.W.3d at 306. "Such a rule would enable employers to simply manipulate titles and salaries to prevent terminated or demoted employees from ever establishing a prima facie case." *Id.* "Instead, we must look not merely to the employees' titles and salaries, but also to their actual duties, comparing the duties of the plaintiff's prior position with those of the employee []he alleges replaced h[im]." *Id.* (citing *Baker v. Gregg Cty.*, 33 S.W.3d 72, 81 (Tex. App.—Texarkana 2000, no pet.) ("A determination of whether an employee was actually replaced by another requires an inquiry into the job position and duties performed by the terminated employee, and an inquiry into the work performed by the person who is alleged to have replaced that employee.")).

McNeely was terminated from his assistant professorship. Although UTHSC claimed that this was a voluntary position, McNeely's memorandum of employment provided some evidence that this was a paid faculty position. After McNeely was terminated from this role, Clendeninn was given the role of assistant professor in the same Department. McNeely also showed that he was terminated from his position as a staff physician effective September 1 and that Clendeninn, who occupied the same position, albeit without benefits, was retained. McNeely also argued and introduced some evidence that, although Clendeninn transitioned into the role of assistant professor and was no longer a staff physician after August 1, the ASC contracted with UTHSC to provide a medical director to the ASC and that, as a result, Clendeninn also performed the same functions and job duties because of his employment with

18

UTHSC that McNeely had performed in his position as a staff physician. Clendeninn also soon began receiving benefits. Because we take as true all evidence favorable to McNeely in reviewing the plea to the jurisdiction, we find that McNeely made a prime facie case for purposes of this analysis, creating a rebuttable presumption of age discrimination. *See Flores*, 612 S.W.3d at 307–08 (If "the plaintiff was removed from h[is] position, that position was not filled, an existing employee was given a new and different position, and the existing employee was assigned some but not all of the plaintiff's former duties . . . the evidence is sufficient to create a fact issue over whether the existing employee truly replaced the plaintiff if the existing employee's duties in her new position are so similar to the plaintiff's former duties that a reasonable juror could conclude that the existing employee actually took or was placed in the plaintiff's former job or position.").

UTHSC sought to rebut this presumption by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action. *See McDonnell Douglas Corp.*, 411 U.S. at 802. It cited several reasons for McNeely's termination, including (1) a reduction in force because of budget concerns and (2) McNeely's "lack in regional anesthesia techniques, organizational inefficiency, continuous medical leave, and inability to manage the organizational and financial performance of the ASC." UTHSC's evidence, including Eltzschig's declaration, emails regarding the budget meeting, and Eltzschig's letter to the president and dean requesting approval for McNeely's termination due to budget constraints, constituted evidence of a non-discriminatory reason for McNeely's termination, as did Eltzschig's and Gumbert's declarations about McNeely's performance as medical director of the ASC. *See M.D. Anderson Hosp. &*

19

*Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24–25 (Tex. 2000) (finding that a reduction in force is a legitimate nondiscriminatory reason for a disputed employment action); *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 438 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (an employer's perception of subpar performance is a legitimate nondiscriminatory reason); *see also White v. Schlumberger Ltd.*, No. 01-05-00685-CV, 2006 WL 948074, at *4 (Tex. App.—Houston [1st Dist.] Apr. 13, 2006, no pet.) (mem. op.); *Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 438 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

"Once an employer produces sufficient evidence to support a non-discriminatory explanation for its decision, a plaintiff must be afforded the opportunity to show 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *White*, 2006 WL 948074, at *4 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)). "That is, a plaintiff may attempt to prove that he was the victim of intentional discrimination 'by showing that the [defendant's] proffered explanation is unworthy of credence.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

Regarding the reduction in force, McNeely argued that he presented evidence that UTHSC sought to replace him as medical director of the ASC before any notice about budget cuts. Emails from CRNAs who attended a meeting before notice of any reduction in force showed that Eltzschig said he would be replacing McNeely with Clendeninn as medical director. While this could be construed as evidence that UTHSC wanted to oust McNeely from the

20

medical directorship,[10] there was no evidence that UTHSC wanted to terminate McNeely from his position as assistant professor and staff physician before the budget cuts. Even so, McNeely argued that there was no reduction in force after citing to evidence that the Department hired more employees following his departure. Given the standard of review, we will assume that McNeely created a fact issue on the question of whether UTHSC's proffered reason of terminating McNeely due to budget concerns was false.

Moving to questions about McNeely's job performance, UTHSC said that concerns about McNeely's performance in his role as medical director, including a lack in regional anesthesia techniques, organizational inefficiency, and inability to manage the organizational and financial performance of the ASC, contributed to his termination. Gumbert said McNeely "was limited in his ability to perform advanced regional anesthesia procedures requested by surgical stakeholders" at the ASC. In response, McNeely introduced letters from students, which spoke to his skill as a teacher, and colleagues addressing his positions at UTHSC and the ASC. The letters from colleagues praised McNeely's attitude and general skill and stated that his contributions to the ASC contributed to its growth. McNeely also introduced a positive, June 2017 evaluation from the ASC.[11] In any case, UTHSC's claimed deficiencies in performance related only to McNeely's role as medical director, but UTHSC did not employ McNeely in that capacity. The evidence shows that McNeely could have continued to serve as a staff physician and assistant professor even if he was not the ASC's medical director, and UTHSC's proffered

---

[10]ASC—not UTHSC—employed McNeely in this position and, no TWC complaint was filed against ASC for the termination of McNeely's position as Medical Director.

[11]Neither the evaluation form nor the letters of support from colleges discussed whether McNeely was proficient in regional anesthesia techniques, and there was also no performance review for 2018.

21

reason for termination due to job performance did not specifically address any deficiency McNeely had as staff physician or assistant professor. Thus, at this stage, we will assume that McNeely presented enough evidence to create a fact issue on whether the proffered reason for his termination at UTHSC—job performance at the ASC—was false.

However, something more was required. "[I]f the employer provides evidence of a legitimate reason for the adverse action, under the federal standard, the employee must prove the adverse action would not have occurred 'but for' the protected activity." *Alamo Heights*, 544 S.W.3d at 782. "The but-for causation standard is significantly more difficult to prove than prima facie causation." *Id.* The Houston First Court of Appeals has applied this "but-for" standard of causation. *City of Houston v. Trimmer-Davis*, No. 01-19-00088-CV, 2020 WL 4983253, at *4 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.). (mem. op.). As a result, because UTHSC produced evidence of a nondiscriminatory reason for McNeely's termination, "the burden of production shift[ed] back to [McNeely] to show that the [UTHSC]'s stated reason was a pretext for discrimination." *Democratic Sch. Rsch., Inc.*, 608 S.W.3d at 308. Although there was a fact issue on whether UTHSC's proffered nondiscriminatory reason for termination of employment was false, "an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false *and* a pretext for discrimination." *Alamo Heights*, 544 S.W.3d at 782 (emphasis added). In *Baker Hughes Oilfield Operations, Inc. v. Williams*, the Houston First Court of Appeals wrote:

> In *Reeves*, the United States Supreme Court explained that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination," which "may be quite persuasive" and, "[*i*]*n appropriate circumstances*, the trier of fact

can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." [*Reeves*, 530 U.S.] at 147[] (emphasis added). Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148 [] (emphasis added). However, the Supreme Court cited with approval its prior holdings that "[i]t is not enough . . . to *dis*believe the employer; the fact-finder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 . . . (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519[] (1993)). Moreover, the Supreme Court rejected the suggestion that a showing of falsity by the plaintiff would "always be adequate to sustain a jury's finding of liability," and it recognized that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." *Id.* at 148[]. For example, "an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*; *see also Little v. Tex. Dep't of Criminal Justice*, 177 S.W.3d 624, 632 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (reviewing *Reeves* and stating that Supreme Court "has made it clear that it is not sufficient merely to show that the employer's reasons are false or not credible; the plaintiff must prove that the employer discriminated intentionally"). Accordingly, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–149[].

*Baker Hughes Oilfield Operations, Inc. v. Williams*, 360 S.W.3d 15, 22–23 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "Citing to *Reeves*, the Texas Supreme Court has made clear that a plaintiff seeking to recover under the Act for illegal discrimination in a case involving an allegation of pretext must show both that the reason proffered by the employer is "false, *and* that discrimination was the real reason." *Id.* at 23 (quoting *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515);

23

*see Hudgens v. Univ. of Tex. MD Anderson Cancer Ctr.*, 615 S.W.3d 634, 646 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

As a result, "[t]he relevant inquiry is not whether the complaints made against [the employee] were a pretext, but what they were a pretext for." *Canchola*, 121 S.W.3d at 740. There must be evidence that the employer "was motivated to terminate [the employee] because of [discrimination]." *Id.* This is because, "in a discrimination case brought under the TCHRA . . . the employee still bears 'the ultimate burden' to prove that the employer discriminated against him because of a prohibited consideration." *Hudgens*, 615 S.W.3d at 645 ("[A] disagreement with the employer's determination of inadequate work performance generally is not sufficient to raise a fact issue on pretext . . . . The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the employment determination.").

Because "[s]ubjective beliefs are insufficient," McNeely's "subjective belief that he was terminated based on [age] . . . is insufficient to create a fact issue about whether [UTHSC's] legitimate nondiscriminatory reason for terminating [him] was pretextual." *Willrich*, 28 S.W.3d at 25. To avoid the plea to the jurisdiction, McNeely "had to provide more than a scintilla of evidence that the true reason that [UTHSC] terminated his employment was [age] discrimination." *White*, 2006 WL 948074, at *4–5.

Here, McNeely argues that he has shown that UTHSC intended to replace him with younger employees because it brought in Wu and Vaid-Pinyard. The evidence showed that Wu

24

and Vaid-Pinyard were not brought in to replace McNeely's positions at UTHSC.[12] As a result, the only evidence cited by McNeely to support his claim of age discrimination is Eltzschig's decision on Clendeninn's appointment as medical director at the ASC, but this did not serve as notice that Eltzschig sought to replace McNeely in the role of staff physician or assistant professor at UTHSC. Moreover, even had there been evidence that UTHSC sought to replace McNeely with Clendeninn as staff physician and assistant professor, "[i]n the absence of other evidence of an unlawful employment practice, evidence of the employment of one person in place of another is not sufficient to establish an unlawful employment practice." TEX. LABOR CODE ANN. § 21.061. After scouring the record for other evidence of age discrimination, we have found none.[13] *See Hudgens*, 615 S.W.3d at 645 (discussing cases where there was other evidence of unlawful employment practice including age-related remarks before termination, severance packages prepared for fourteen employees over fifty years old to "thin the ranks," and statistical evidence that older employees had a higher rate of turnover than younger counterparts).

"All elements of a TCHRA circumstantial-evidence claim are, perforce, jurisdictional." *Alamo Heights*, 544 S.W.3d at 783. If "jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea." *Id.* ("[T]he burden-shifting scheme *in*

---

[12]Instead, they were being considered for the position of co-medical director at ACS. Although Sen was also considered in this capacity, nothing showed that she was a doctor under forty. Also, although Eltzschig said he was replacing McNeely with Clendeninn, nothing showed that it was because of McNeely's age or Clendeninn's youth.

[13]We also note that there is no evidence of the age of the other two doctors who were selected for non-reappointment by UTHSC.

*toto* defines the jurisdictional facts."). "The absence of a presumption triggers the plaintiff's duty to create a fact question on the ultimate issue—whether [age discrimination] caused the adverse employment action—to survive a jurisdictional challenge." *Id.* at 784.

Although McNeely "was an older employee whom the Texas Commission on Human Rights Act protects against age discrimination, he has failed to present evidence from which a reasonable juror could conclude that [his] age was a motivating factor behind" his termination. *Flores*, 612 S.W.3d at 314. McNeely "had to provide more than a scintilla of evidence that the true reason that [UTHSC] terminated his employment was [age] discrimination." *White*, 2006 WL 948074, at *5. Because we conclude that he did not, the TCHRA did not waive UTHSC's "sovereign immunity from this suit, and the trial court therefore erred by not granting its plea to the jurisdiction." *Id.*; *see Suarez v. City of Tex. City*, 465 S.W.3d 623, 631–32 (Tex. 2015) (Absent a valid waiver of immunity, the court lacked subject-matter jurisdiction).

We reverse the trial court's order denying the plea to the jurisdiction and render judgment dismissing McNeely's claims for lack of jurisdiction.[14]

Josh R. Morriss, III
Chief Justice

Date Submitted:     August 11, 2021
Date Decided:       October 26, 2021

---

[14]McNeely argues that, "[a]t a minimum, even if no direct or circumstantial evidence existed raising fact issues . . . [he] should be allowed targeted discovery regarding the evidentiary claims made by UTHealth in its plea to the jurisdiction." It is true that "trial courts considering a plea to the jurisdiction have broad discretion to allow 'reasonable opportunity for targeted discovery' and to grant parties more time to gather evidence and prepare for such hearings." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 642–43 (Tex. 2012) (quoting *Miranda*, 133 S.W.3d at 233). Yet, this provision contemplates "alter[ing] hearing deadlines to allow parties the opportunity to respond with evidence." *Alamo Heights*, 544 S.W.3d at 786. Here, the trial court did not alter hearing deadlines, but denied the plea to the jurisdiction.

27